COPY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
*******************************************************
XO-SHEN ZHOU, a/k/a JASON ZHOU,

                                        Plaintiff,

vs.                                Civil #: 6:08-CV-444

SUNY INSTITUTE OF TECHNOLOGY; DRS. LISA
BERNARDINO; STEPHEN HAVLOVIC; WILLIAM
LANGDON; PETER SPINA, PERSONALLY AND
IN THEIR OFFICIAL CAPACITY,

                                        Defendants.
*******************************************************

        Transcript of the Examination Before Trial

    of LISA BERARDINO, a Witness called for the

    purpose of discovery, taken on June 9, 2010, at

    SUNY IT, Utica, New York, taken before Angela S.

    Stangel, Court Reporter and Notary Public,

    pursuant to Notice.

                    ANGELA S. STANGEL
                     Court Reporter
                  10455 Webster Hill Road
                 Boonville, New York 13309
                     (315) 827-4010

2

```
 1                 A P P E A R A N C E S

 2

 3

 4
         For Plaintiff:
 5
              SATTER & ANDREWS, LLP
 6       BY:  ROSS P. ANDREWS, ESQ.
              217 South Salina Street
 7            Sixth Floor
              Syracuse, New York  13202
 8

 9

10

11
         For Defendants:
12
              STATE OF NEW YORK
13            OFFICE OF THE ATTORNEY GENERAL
         BY:  DOUGLAS J. GOGLIA, ESQ.
14            The Capitol
              Albany, New York  12224-0341
15

16       ALSO PRESENT:  ANTHONY F. PANEBIANCO, Associate Vice
         President, SUNY IT
17

18

19

20

21

22

23

24

25
```

1    S T I P U L A T I O N S

2

3            IT IS HEREBY STIPULATED AND AGREED

4    that the transcript may be signed before any

5    Notary Public with the same force and effect as

6    if signed before a clerk or Judge of the Court;

7    and it is

8

9            FURTHER STIPULATED AND AGREED that

10   this deposition may be utilized for all purposes

11   as provided by the Federal Rules of Civil

12   Procedure; and it is

13

14            FURTHER STIPULATED AND AGREED that

15   all rights provided to all parties by the Federal

16   Rules of Civil Procedure shall not be deemed

17   waived and the appropriate sections of the

18   Federal Rules of Civil Procedure shall be

19   controlling with respect thereto.

20

21

22   ***********************************

23

24

25

4

1         **I N D E X   O F   W I T N E S S**

2

3      **WITNESS**                      **PAGE**

4 LISA BERARDINO

5     By Mr. Andrews                  5

6

7      **EXHIBIT**                      **PAGE**

| EXHIBIT | PAGE |
|---|---|
| 49 – HANDWRITTEN NOTES, BATES 572–573 | 42 |
| 50 – HANDWRITTEN NOTES, BATES 559–561 | 42 |
| 51 – RECOMMENDED TIME TABLE, BATES 555 | 42 |
| 52 – MEMO 11/15/06 | 42 |
| 53 – MEMO 10/31/06, BATES 227 | 91 |
| 54 – HANDWRITTEN NOTES | 99 |
| 55 – E-MAIL | 99 |
| 56 – COMMENTS, BATES 351 | 105 |
| 57 – LETTER ON JARREL, BATES 503 | 119 |
| 58 – BATES 504–505 | 119 |
| 59 – MEMO 3/31/08, BATES 217 | 126 |
| 60 – SLN FORM, BATES 322 | 130 |
| 61 – MEMO 11/14/06, BATES 00159 | 156 |

15      **REQUEST**                      **PAGE**

16 By Mr. Ross:

| REQUEST | PAGE |
|---|---|
| 1 – FALL '05 ACCTG 685-35 ON-LINE RATINGS | 109 |
| 2 – E-MAIL FROM DEAN TO BERARDINO | 163 |
| 3 – CONTENTS OF DEAN'S FOLDER & PAGE NUMBERS | 189 |

20

21

22

23

24

25

LISA BERARDINO BY MR. ANDREWS

1   faculty in putting together a binder, it was to
2   refer them to resource materials; is that a fair
3   statement?
4       A.   That is fair.
5       Q.   So you didn't have any further
6   participation in putting together another faculty
7   member's binder?
8       A.   That is correct.
9       Q.   So you were referring to the criteria?
10      A.   Yes.
11      Q.   Which guides the faculty member in
12  putting together their own binder?
13      A.   Uh-huh.  Yes.
14      Q.   So what does the faculty member do once
15  they have assembled the binder?
16      A.   Okay, according to the timeline they
17  deliver it to the School of Business where the
18  binder is available for all of the tenured
19  faculty to review the binder.  At this time we
20  had a three person Peer Review Committee that
21  reviewed the binder material in addition to other
22  available material.  And the Peer Review of
23  three, we make a recommendation and then we go in
24  to the all tenured and make the decision in the
25  all tenured faculty meeting.  From there the

LISA BERARDINO BY MR. ANDREWS

1  when Robert and I come in the members have seen

2  that memo and then we present it and take any

3  questions.

4  Q.  I think you said you also presented a

5  summary, no?

6  A.  What I meant was that we are presenting

7  the decision of the School of Business.  I meant

8  to say that we are presenting the decision of the

9  School of Business.

10  Q.  And then questions were asked of you and

11  Doctor Yeh; is that correct?

12  A.  At the first meeting there were not

13  questions.

14  Q.  The first meeting of the College Wide

15  Personnel Committee?

16  A.  That is correct.

17  Q.  That was just for presentation?

18  A.  Let's see, the Committee said that they

19  would not consider our candidates in the form,

20  that the memos were too brief.

21  Q.  So did you go back and prepare a more

22  detailed memo?

23  A.  So we were given a week to go prepare a

24  more detailed memo.

25  Q.  At that first College Wide Personnel

LISA BERARDINO BY MR. ANDREWS

1    Committee meeting that you have been discussing

2    did you also present regarding Doctor Gaffney?

3        A.    Let's see, all three memos were told to

4    be revised.

5        Q.    You obviously anticipated my ultimate

6    question.  Before that time had you presented

7    memos to the College Wide Personnel Committee?

8        A.    No.

9        Q.    So that was your first occasion to do

10   so?

11       A.    Yes.

12       Q.    So did you, in fact, prepare a more

13   detailed memo?

14       A.    Okay --

15       Q.    I am sorry?

16       A.    I am just pausing.  I followed up on the

17   instructions of College Wide by E-mailing

18   requests for more information to the Dean and the

19   two coordinators, the coordinator of

20   undergraduate programs, Bob Orillio, and

21   coordinator of finance and accounting, Will

22   Langdon.

23       Q.    Is that what the College Wide Personnel

24   Committee had directed you to do?

25       A.    That was my understanding.

LISA BERARDINO BY MR. ANDREWS

1    Q.    Did the College Wide Personnel Committee
2    say to contact those people for additional
3    information?
4    A.    I am going to say no.
5    Q.    Now, there was a considerable amount of
6    information in the binder assembled by
7    Doctor Zhou; is that correct?
8    A.    Yes.
9    Q.    Was that information used in whole or in
10   part in preparing the more detailed memo?
11   A.    I am going to say yes, because the IDEA
12   evaluations are in there and the IDEA evaluations
13   are used.  So yes, some of the information from
14   the binder is used in the revised letter.
15   Q.    It's Doctor Langdon; is that correct?
16   A.    Yes, Doctor Langdon.
17   Q.    Does Doctor Langdon have a separate role
18   in this process other than what you asked him to
19   do?
20   A.    No separate role other than what I asked
21   him to do.
22   Q.    He was a part of the all tenured faculty
23   meeting?
24   A.    Yes.
25   Q.    And also Doctor Orillio?

LISA BERARDINO BY MR. ANDREWS

1    A.    Yes.

2    Q.    Why did you contact Doctor Langdon for

3    additional information?

4    A.    Okay.  The College Wide has asked for a

5    revised memo that has more narrative information

6    and I contacted the Dean, Bob Orillio, and Will

7    Langdon requesting for more information,

8    especially about the nature of the performance in

9    teaching.

10   Q.    When you say the Dean, can you more

11   fully identify who you are referring to?

12   A.    Steve Havlovic.

13   Q.    Orillio's title again, Doctor Orillio's

14   title again is what with regard to this process?

15   A.    He is the coordinator of undergraduate

16   business degree programs.  He is the adviser to

17   undergraduates.

18   Q.    And more fully Doctor Langdon's title

19   was?

20   A.    He is the coordinator for finance and

21   accounting.

22   Q.    Did you contact Dean Havlovic with

23   regard to Ms. Gaffney's application?

24   A.    No.

25   Q.    Did you contact Dean Havlovic with

LISA BERARDINO BY MR. ANDREWS

1   regard to Doctor Jarrel's application?

2       A.    No.

3       Q.    Did you contact either Doctor Langdon or

4   Doctor Orillio with regard to Doctor Gaffney or

5   Doctor Jarrel's applications?

6       A.    No.

7       Q.    So just Doctor Zhou?

8       A.    That is correct.

9       Q.    So was there another meeting of the

10  College Wide Personnel Committee a week later?

11      A.    Yes.

12      Q.    And a more detailed memo had been

13  forwarded to Doctor Pittarelli?

14      A.    Yes, Mike Pittarelli.

15      Q.    And the three business department

16  reviews were considered at that meeting; is that

17  correct?

18      A.    Yes.

19      Q.    Were more detailed memos provided with

20  regard to Doctors Gaffney and Jarrel?

21      A.    Yes, yes.

22                      (Whereupon, Plaintiff

23                      Attorney/Client discussion was held

24                      off the record.)

25

LISA BERARDINO BY MR. ANDREWS

1    BY MR. ANDREWS:

2        Q.    Was anything else presented to the

3    College Wide Personnel Committee other than the

4    more detailed memos?

5        A.    Yes.

6        Q.    What additional information was

7    presented?

8        A.    At the opening when we began to consider

9    Zhou, at the beginning of that Robert Yeh told

10   the group that the information from Will Langdon

11   was a personal conflict between Will Langdon and

12   Zhou.

13       Q.    Was any other information provided to

14   the College Wide Personnel Committee?

15       A.    They asked me had there been a peer

16   review of his teaching and I said, yes, that I

17   had sat in on his teaching and that I saw the

18   teaching as average.

19       Q.    Was any other information presented to

20   the College Wide Personnel Committee regarding

21   Doctor Zhou?

22       A.    No.

23       Q.    There was no direct communication from

24   Doctor Langdon presented to the College Wide

25   Personnel Committee?

LISA BERARDINO BY MR. ANDREWS

1    A.    There is a memo that I sent along with
2    the letter and that is what Robert Yeh was
3    referring to.
4    .   Q.    Did Doctor Yeh further characterize what
5    the conflict was between --
6    A.    No.
7    Q.    -- Doctor Zhou and Doctor Langdon?
8    A.    No.
9    Q.    Were there any questions as to the
10   nature of that conflict?
11   A.    No.
12   Q.    Eventually there was a vote of the
13   College Wide Personnel Committee with regard to
14   Doctor Zhou's application; is that correct?
15   A.    That is correct.
16   Q.    What was that vote?
17   A.    The College Wide Committee did not
18   support the School of Business vote of no.
19   Q.    In other words, the College Wide
20   Personnel Committee did support Doctor Zhou's
21   application for renewal?
22   A.    I am not going to phrase it that way.
23   My understanding is that the College Wide is
24   voting not to support our vote of no.
25                    MR. GOGLIA:  I am sorry, I am a

LISA BERARDINO BY MR. ANDREWS

1    little confused.

2         MR. ANDREWS:  Me too, but I will

3    get there.

4    BY MR. ANDREWS:

5    Q.    Again, there was a vote with regard to

6    Doctor Zhou's --

7    A.    Yes.

8    Q.    -- application for renewal?

9    A.    Yes.

10   Q.    Is it fair to say that the vote, the

11   choices in the vote were not renewing and

12   renewing?

13   A.    We are speaking at College Wide?

14   Q.    Yes.

15   A.    My understanding is that the vote is is

16   the College Wide supporting the School of

17   Business decision, are they supporting our

18   decision not to renew.

19   Q.    So you don't understand the College Wide

20   Personnel Committee as having expressed

21   collectively an opinion that Doctor Zhou should

22   be renewed?

23   A.    I am agreeing with you, yes.  I

24   understood the College Wide vote that they did

25   not -- they felt like they did not have enough

LISA BERARDINO BY MR. ANDREWS

1   understanding and information to support the

2   college vote of no renewal.

3       Q.   With regard to Doctor Gaffney was there

4   a vote of the College Wide Committee?

5       A.   Yes.

6       Q.   And what was the result of that vote?

7       A.   Okay.  So they voted to support the

8   school's decision of offering two year renewal.

9       Q.   And the same is true of Doctor Jarrel?

10      A.   They support our vote of two year

11  renewal.

12      Q.   You said a minute ago that you thought

13  the College Wide committee decided they didn't

14  have enough information to support the School of

15  Business' decision not to renew Doctor Zhou; is

16  that correct?

17      A.   I did say that.  I should amend.  I

18  don't know why the school -- I don't know why the

19  College Wide voted as they did.  So all I can say

20  is that they voted no support of our decision.

21      Q.   I think you said this was your first

22  experience with the College Wide Committee?

23      A.   Yes.

24      Q.   Have you had subsequent experience with

25  the College Wide Committee?

41

LISA BERARDINO BY MR. ANDREWS

1       A.    I come in as advocate now.

2       Q.    Are you aware of any other instance

3   where the College Wide Committee decided not to

4   support the determination of a departmental

5   decision?

6       A.    I am not aware of another time that the

7   College Wide did not support a school decision.

8       Q.    You have never heard of that happening

9   other than with Doctor Zhou?

10      A.    That is correct.

11      Q.    So as I understand the process, after

12  the College Wide Personnel Committee's

13  consideration, a letter is forwarded to the Vice

14  President for academic affairs, is that what it

15  is?

16      A.    That is my understanding is that Mike

17  Pittarelli -- you are asking about the College

18  Wide?

19      Q.    Yes.

20      A.    That Mike Pittarelli writes a letter and

21  it goes to the VP.  That is my understanding.

22      Q.    Was that letter circulated to members of

23  the College Wide Personnel Committee?

24      A.    No, no.

25                  (Whereupon, a brief recess was

LISA BERARDINO BY MR. ANDREWS

1   Q.   Did you take part in that vote?

2   A.   My recollection is that, yes.

3   Q.   You were the one no vote?

4   A.   Yes.

5   Q.   Can you read the word that is below the

6   recording of the vote there?

7   A.   It looks like it says warning.

8   Q.   Do you have any idea what that refers

9   to?

10   A.   No recollection.

11   Q.   Below that it says don't want to throw

12   away someone who can develop?

13   A.   Yes.

14   Q.   Was that a statement made during the

15   College Wide meeting, College Wide Committee

16   meeting?

17   A.   Yes.

18   Q.   Do you recall who made that statement?

19   A.   No, I do not.

20   Q.   Do you recall if that was the sentiment

21   of those who voted yes?

22   A.   At least one person said that.  One

23   person said that.

24   Q.   Below that does it say stronger letter?

25   A.   It does say stronger letter.

LISA BERARDINO BY MR. ANDREWS

1    Q.    Do you know what that refers to?

2    A.    I believe that this was a criticism of

3    the memo that I had prepared, that it needed to

4    be a stronger letter.

5    Q.    When you say the memo that you prepared,

6    what are you referring to?

7    A.    The one that went to Mike Pittarelli and

8    sent to College Wide.

9    Q.    Would this be the first one or second

10   one?

11   A.    The second one.

12   Q.    So they still felt that was not what it

13   should be?

14   A.    That is my understanding.

15   Q.    Who made that statement?

16   A.    Someone in the College Wide Committee.

17   Q.    So, again, you think that is a statement

18   by one person?

19   A.    Yes.

20   Q.    What does it say below that?

21   A.    File warrants one year, AG service.

22   Q.    Then looking below that slightly to the

23   right it appears to say Robert?

24   A.    Yes, Robert.

25   Q.    Does it refer to Doctor Yeh?

LISA BERARDINO BY MR. ANDREWS

1    Q.   Going down to where it says D,

2  university/community service, do you see that?

3    A.   Yes.

4    Q.   There are some handwritten notations

5  there; is that correct?

6    A.   Yes.

7    Q.   After where it says Jason Zhou serves on

8  the Budget and Planning Committee?

9    A.   Yes.

10    Q.   Can you tell me what it says below

11  there?

12    A.   Bing, Bong, B-I-N-G, B-O-N-G,

13  International Student Association.

14    Q.   There is a comma between the two of

15  those; is that correct?

16    A.   Yes.

17    Q.   Do those refer to activities that

18  Doctor Zhou took part in?

19    A.   Yes.

20    Q.   Can you tell me why that was not listed

21  on the memorandum itself?

22    A.   No.

23    Q.   Those are examples of

24  university/community service correct?

25    A.   Yes.

LISA BERARDINO BY MR. ANDREWS

1    have familiarity with, correct?

2        A.    Correct.

3        Q.    This related in particular to the 2006

4    review of personnel actions, correct?

5        A.    Correct.

6        Q.    But this is similar to the calendar that

7    is established for other years also, correct?

8        A.    Correct.

9        Q.    So it would be similar to the calendar

10   utilized when you, yourself, were reviewed in the

11   past?

12       A.    Correct.

13       Q.    Is there somewhere on there that it

14   talks about members of the Peer Review Committee

15   soliciting the opinion of the Dean?

16       A.    No.

17             MR. GOGLIA:   The document speaks

18             for itself.   Thank you.

19             MR. ANDREWS:   I want her

20             interpretation of it and I am entitled

21             to her interpretation of it.

22             MR. GOGLIA:   You can answer the

23             question.

24       A.    No.

25

LISA BERARDINO BY MR. ANDREWS

1    A.    Correct.

2    Q.    Was there a prior conversation when you

3    decided he should send the memo?

4    A.    I sent an E-mail.  I sent an E-mail.

5    Q.    To Doctor Langdon?

6    A.    To Doctor Langdon, Steve Havlovic, and

7    Bob Orillio requesting that the Academic

8    Committee had requested more information.

9    Q.    When you say the Academic Committee?

10   A.    The College Wide, the College Wide.

11   Q.    Right.  Now you sent that memo to those

12   individuals?

13   A.    Yes, I did.

14   Q.    Was that on behalf of your fellow Peer

15   Review Committee members?

16   A.    I am acting on behalf of the Peer

17   Review.

18   Q.    Did Doctor Yeh say that those people

19   should be solicited to provide information?

20   A.    No.

21   Q.    Did Mr. Petronio?

22   A.    No.

23   Q.    So that was a decision that you made?

24   A.    I am responding to what the College Wide

25   Committee said that we needed to do.

LISA BERARDINO BY MR. ANDREWS

1      Q.    But they didn't ask you to contact those

2    people?

3      A.    No.

4      Q.    They asked you to get more information?

5      A.    Yes.

6      Q.    And there was more information that you

7    had not provided that was in Doctor Zhou's

8    portfolio?

9              MR. GOGLIA:   Objection.  I am just

10             not sure what you mean by portfolio.

11   BY MR. ANDREWS:

12     Q.    Well, there was a file with Mr. Zhou's

13   own material that he submitted, correct?

14     A.    That is correct.

15     Q.    There was information in that file that

16   had not been included in what you had provided to

17   the College Wide Committee, correct?

18     A.    Are you saying that the binders are like

19   that?

20     Q.    Correct.

21     A.    And I am turning in a summary page?

22     Q.    Correct.

23     A.    So yes, there is going to be

24   information.

25     Q.    By it's very nature it's a summary?

LISA BERARDINO BY MR. ANDREWS

1      A.     Yes.

2      Q.     But what they were asking you for was a

3      more detailed summary?

4      A.     They were asking for more explanation

5      and understanding of the student complaints and

6      the performance, the teaching performance

7      problems.  For that information I felt like I

8      needed to go to the coordinators because the

9      coordinators are getting the student complaints.

10     Q.     I would like to show you again a

11     document marked as Exhibit 49?

12     A.     Okay.

13     Q.     I think you said that was your recording

14     of what was requested of you by the College Wide

15     Committee?

16     A.     Yes.

17     Q.     There is no reference to student

18     complaints in what they asked you to get

19     information about, is there?

20     A.     Present all evidence (indicating).

21     Q.     Present all evidence.  That doesn't just

22     relate to student complaints.  It doesn't relate

23     to just one factor, it relates to all evidence,

24     correct, correct?

25     A.     Please restate what you said.

LISA BERARDINO BY MR. ANDREWS

1    Q.    Yes.  I asked you to point out where the

2    Committee directed to you get more information

3    about student complaints?

4    A.    Okay.

5    Q.    And I showed you the document where you

6    wrote down what the Committee requested from you?

7    A.    Okay.

8    Q.    And you have just reviewed that

9    document, correct?

10   A.    Correct.

11   Q.    I asked you where it says that you were

12   to provide more information about student

13   complaints, correct?

14   A.    Correct.

15   Q.    And you pointed to a point in the memo

16   where it says present all evidence, correct?

17   A.    That is correct.

18   Q.    Wouldn't that relate to all evidence,

19   not just information about student complaints?

20   A.    The Committee requested more

21   information.

22   Q.    And you interpreted that as more

23   information about student complaints?

24   A.    And in particular the issue under

25   discussion is teaching.  So I do take back

91

LISA BERARDINO BY MR. ANDREWS

1    student complaints.  I do take that back.  There

2    is a request for more information and more

3    information about the problems in teaching.

4        Q.    But it doesn't just say in your notes

5    that it's relating to teaching, does it?

6        A.    Not in my notes.

7        Q.    In fact, it says that they wanted

8    expanded information about a variety of topics,

9    about most of the criteria, correct?

10       A.    Yes, it does.

11       Q.    So for example, they wanted more

12   information about Doctor Zhou's service?

13       A.    That is correct.

14       Q.    Such as the information that you hand

15   wrote on the memo, but never provided to the

16   College Wide Committee, correct?

17       A.    Correct.

18       Q.    I would like to show you a document that

19   I would ask to be marked as Exhibit 53.

20                    (Exhibit 53 marked for

21                    identification.)

22   BY MR. ANDREWS:

23       Q.    Doctor, can you take a look at that for

24   me, please.  Do you recognize this document?

25       A.    Not yet.  So this is Maureen

LISA BERARDINO BY MR. ANDREWS

1    Doctor Gaffney's you added -- you cut and pasted

2    some information regarding publications?

3        A.    Yes, yes.

4        Q.    On the first page of this document it's

5    just something that looks a little funny to me.

6    So I am going to ask you about it.  It says the

7    School of Business Personnel Committee reviewed

8    the application from, then it's redacted, for a

9    two year reappointment and approved it by a vote

10   of zero to eight?

11       A.    Okay.

12       Q.    They means they voted eight to zero in

13   favor of Doctor Gaffney being reappointed, right?

14       A.    That is correct.

15       Q.    Is that usual to write the wining number

16   on the right on these things?

17       A.    I don't know what is usual.

18       Q.    Is that something you think you could

19   have done?

20       A.    I could have done that.

21             MR. GOGLIA:  We will stipulate to

22             the fact that it looks odd.

23             MR. ANDREWS:  Just wondered if that

24             refreshed her recollection if that is an

25             idiosyncrasy.

LISA BERARDINO BY MR. ANDREWS

1   you have seen this document before?

2       A.    I don't recall it.

3       Q.    If it was a part of Doctor Gaffney's

4   binder would you have seen it?

5       A.    Probably.

6       Q.    Do you recognize what this document is?

7       A.    I believe it's three -- I believe it's

8   three different individuals commenting.

9       Q.    So these would be three students

10  commenting about the class that this form relates

11  to?

12      A.    I can't tell if it's three different

13  students.  It just says comments.

14      Q.    Have you seen this type of thing before?

15      A.    I am going to say that yes, it's the end

16  comment from the on-line with the student

17  comments typed in.  Yes, I have seen this, this

18  type.

19      Q.    And usually there are multiple comments

20  on a form like this; is that fair to say?

21      A.    Yes.

22      Q.    So, in fact, this may be three separate

23  comments?

24      A.    Yes.

25      Q.    If we assume for the moment that these

LISA BERARDINO BY MR. ANDREWS

1   are three separate comments, looking at the first
2   one starting even by the end of the course and
3   ending with the line possible technical problems
4   on their side.  Do you see what I am referring
5   to?
6       A.    No.
7       Q.    That was not a very good way to describe
8   it.  If you look at the first three lines and
9   assume that that is a single comment.
10      A.    I see it now.
11      Q.    Would you characterize that as a
12  positive comment or a negative comment?
13      A.    Negative.
14      Q.    Looking at the last five lines on this
15  sheet, would you describe that as predominantly
16  positive or predominantly negative?
17      A.    Well, there is some positive and some --
18  the last, I love his supplementary material,
19  would be positive.  The rest of it looks
20  negative.
21      Q.    So it's predominantly negative?
22      A.    Yes.
23      Q.    Now, these comments are not discussed in
24  Doctor Gaffney's summary that was prepared by the
25  Committee; is that correct?

LISA BERARDINO BY MR. ANDREWS

1      A.    That is correct.

2      Q.    So there was no reference to there being

3   negative comments, do you recall offhand?

4      A.    I don't recall.  I don't recall.

5      Q.    Well, I am going to represent to you

6   that they are not listed.  Can you tell me why

7   those wouldn't have been listed?

8      A.    The letter that the Committee produces

9   tries to capture the overall status of the

10   professor's teaching.  And my recollection is

11   that the overall of Professor Gaffney was that

12   there were some weaknesses, but that she was

13   improving and making significant improvements and

14   that she had many favorable students.  So my

15   recollection is that the whole picture of Maureen

16   Frances Gaffney was overall positive.

17            MR. GOGLIA:  I think she meant

18            Maureen Smith-Gaffney.

19      A.    Yes, Maureen Smith-Gaffney.

20   BY MR. ANDREWS:

21      Q.    Well, the document will speak for

22   itself.  Do you happen to recall whether you

23   reviewed Professor Gaffney's on-line ratings?

24      A.    I don't recall.

25            MR. ANDREWS:  In fact, in looking

LISA BERARDINO BY MR. ANDREWS

1       through the disclosure, Doug, it seems

2       that on the Fall 2005 accounting 685-35

3       on-line ratings were not provided.

4       There were students comments disclosed,

5       but no on-line ratings.  Can you look

6       for those?

7               MR. GOGLIA:  Sure.

8               MR. ANDREWS:  It's just the on-line

9       ratings relative to this class.

10              MR. GOGLIA:  Again, I will

11      represent to you that we produced

12      Maureen Gaffney's complete employment

13      file is my recollection.  So to the

14      extent documents are maintained, they

15      should have been there.  Mr. Panebianco

16      and myself will take a look.

17              MR. ANDREWS:  Maybe they are still

18      available somewhere.

19  BY MR. ANDREWS:

20      Q.    Did you ever observe Doctor Gaffney's

21  teaching?

22      A.    No.

23      Q.    How about Doctor Jarrel?

24      A.    No.

25      Q.    Can you again take a look at what has

LISA BERARDINO BY MR. ANDREWS

1   been marked as Exhibit 53?

2       A.   Okay.

3       Q.   Looking on the second page under

4   scholarly ability?

5       A.   Publications?

6       Q.   Actually at the top above where it says

7   publications.  Do you see where I am referring?

8       A.   Yes, okay.

9       Q.   It describes different areas of research

10  that Doctor Gaffney has undertaken?

11      A.   Yes.

12      Q.   Do you think it's important to list that

13  kind of information?

14      A.   It's not typical.

15      Q.   It's not typical for candidates to list

16  that kind of information?

17      A.   The typical is to just have the

18  publications.

19      Q.   But when you prepared this document you

20  put that information in, correct?

21      A.   That is correct.

22      Q.   Looking at the final page it says

23  effectiveness in teaching.  Do you see that at

24  the top?

25      A.   Yes.

111

LISA BERARDINO BY MR. ANDREWS

1    Q.    It suggests that Doctor Gaffney received
2    good teaching evaluations based on the IDEA?
3    A.    Yes.
4    Q.    For example a 3.7 for teaching
5    excellence?
6    A.    Yes.
7    Q.    And so someone receiving a 3.7 is a good
8    teaching evaluation?
9    A.    Yes.
10    Q.    So if someone received higher than a 3.7
11    that also would be a good teaching evaluation,
12    correct?
13    A.    Yes.
14    Q.    Do you recall what the range of
15    Doctor Gaffney's IDEA evaluations was?
16    A.    I do not recall the range.
17    Q.    If I told you there was a 1.5 included
18    would you say that was a good evaluation?
19    A.    No.
20    Q.    That's a rather poor evaluation?
21    A.    Poor.
22    Q.    How about 3.0, is that a good teaching
23    evaluation?
24    A.    Let's see, that is the middle zone.
25    Q.    Would you say that is average?

LISA BERARDINO BY MR. ANDREWS

1    A.    I would say average.

2    Q.    How about 2.4?

3    A.    Okay.  That is the low end of the scale.

4    Q.    So it's somewhere between average and

5    really bad?

6    A.    Yes.

7    Q.    Can you recall why only the 3.7 was

8    listed with regard to Doctor Gaffney as opposed

9    to listing more of the evaluation marks?

10    A.    My recollection is that there is time

11    constraints to get the memos revised, and perhaps

12    under the time constraints that that is keeping

13    the total listing of the IDEA evaluations.

14    Q.    I am sorry.  Under the time constraints

15    what?

16    A.    Recall that it's one week from the

17    revised memos to turning these memos around by

18    the Committee.

19    Q.    So you chose to select the one best

20    rating that Doctor Gaffney had?

21    A.    No.  I am saying in an explanation as to

22    why there is not the full table, I would suggest

23    that the time of recreating a whole table.

24    Q.    Do you recall relative as between

25    Doctor Gaffney and Doctor Zhou how the full

LISA BERARDINO BY MR. ANDREWS

1    Q.    So Doctor Orillio said that he observed

2    Doctor Zhou's teaching?

3    A.    Well, I guess I am going to take it

4    back.  I don't mean of the teaching.  I just mean

5    faculty and the coordinators, what they observe

6    about the teaching.

7    Q.    But not that they actually observed his

8    teaching?

9    A.    That is correct.

10   Q.    Other than you do you know of anyone --

11   A.    I don't know.

12   Q.    -- who observed Doctor Zhou's teaching?

13   A.    I do not know of anyone other than me.

14   Q.    I want to talk a second about the first

15   College Wide Committee meeting.

16   A.    Okay.

17   Q.    At that meeting there was not a

18   presentation of a letter by Doctor Langdon,

19   correct?

20   A.    That is correct.

21   Q.    Then I am going to go to the second

22   meeting.  There was a presentation of a letter by

23   Doctor Langdon, correct?

24   A.    That is not correct.  May I --

25   Q.    Sure.  It was provided in advance?

LISA BERARDINO BY MR. ANDREWS

1          just to be clear, I think we were

2          talking about Maureen Smith-Gaffney,

3          not --

4     A.    I am sorry.

5  BY MR. ANDREWS:

6     Q.    What I asked was was there any

7  discussion of complaints by students about either

8  of those two professors, that's all I asked?

9     A.    No.

10    Q.    I would like you to take a look at a

11 document previously marked Exhibit 17.  Have you

12 seen this document before?

13    A.    Yes, I have.

14    Q.    Is that your initial that appears LB?

15    A.    Yes.

16    Q.    And your handwriting?

17    A.    Yes.

18    Q.    Is this something that you forwarded to

19 the College Wide Academic Personnel Committee?

20    A.    Yes.

21    Q.    Can you tell me whose initials appear on

22 this besides yours?

23    A.    EP would be Ed Petronio.

24    Q.    Was there anyone on the Peer Review

25 Committee whose initials don't appear here?

LISA BERARDINO BY MR. ANDREWS

1    A.    Robert Yeh.

2    Q.    Do you have any knowledge of Doctor Yeh

3  ever having initialed this document?

4    A.    I thought he had.  I thought he had

5  initialed it.

6    Q.    Well, but you don't see it here, right?

7    A.    I don't see it here.

8    Q.    Well, looking at the date November 15,

9  2006, do you see that?

10   A.    I do see that.

11   Q.    Does that suggest to you whether this

12  was the first or second memoranda submitted?

13   A.    Second.

14   Q.    So this was after they asked you for

15  more information, which you came back and

16  submitted to the College Wide academic Personnel

17  Committee?

18   A.    Yes.

19   Q.    Did you draft this document?

20   A.    Yes, I did.

21   Q.    In looking at item A, master of subject

22  matter, it says that Doctor Zhou holds his Ph.D.

23  in finance, correct?

24   A.    Correct.

25   Q.    Had he provided the institution that he

LISA BERARDINO BY MR. ANDREWS

1     A.    I do not know why.  I don't know why.  I

2     amend that.

3     Q.    You know why?

4     A.    The focus was on the teaching.  So the

5     focus of this letter and my understanding of what

6     the Committee wanted was that they wanted to

7     review the teaching.

8     Q.    It's not really correct in terms of what

9     the Committee wanted, is it?

10          MR. GOGLIA:  I am going to object

11          to that question.  It's argumentative.

12    BY MR. ANDREWS:

13    Q.    Okay, then I will show the witness

14    Exhibit 49.  This is a document you testified to

15    previously today, correct?

16    A.    Yes.

17    Q.    And you testified that in the lower left

18    hand corner there was information that was

19    general as to all three applicants as to what the

20    Committee wanted, correct?

21    A.    Correct.

22    Q.    And what does it say next to number

23    five?

24    A.    Expanded.

25    Q.    Thank you.  Focusing on the College Wide

LISA BERARDINO BY MR. ANDREWS

1    Committee, the second College Wide Committee

2    meeting, you attended that meeting, correct?

3        A.    Correct.

4        Q.    And a vote was taken at that meeting on

5    Doctor Zhou's application; is that correct?

6        A.    That is correct.

7        Q.    How did you vote?

8        A.    I voted to support the School of

9    Business decision not to renew Jason Zhou.

10       Q.    We got that in earlier, didn't we?

11       A.    Yes.

12       Q.    Thank you.   You were the one vote in

13   that direction, correct?

14       A.    Correct.

15       Q.    Did the Committee have any discussion

16   regarding Doctor Zhou's application prior to the

17   vote?

18       A.    There was a little bit of discussion,

19   yes.

20       Q.    Did you participate in that discussion?

21       A.    They asked me about my observation of

22   his teaching and I reported it as average.

23       Q.    Was there anything more to your report

24   than just saying it was average?

25       A.    No.

LISA BERARDINO BY MR. ANDREWS

1    Q.   Wasn't the purpose that you -- wasn't

2  the reason that you voted against Doctor Zhou his

3  teaching ability?

4    A.   Yes.

5    Q.   Was there any other criteria in which

6  you felt he was lacking?

7    A.   No.

8    Q.   Yet your own observation of his teaching

9  was that it was average; is that correct?

10    A.   That is correct.

11    Q.   In your belief someone who meets all of

12  the criteria, all of the other criteria and has

13  average teaching is not fit to be reappointed, is

14  that your personal view?

15    A.   Can you say the question again?

16    Q.   Sure.  You felt that he satisfied the

17  other criteria other than teaching?

18    A.   Correct, yes.

19    Q.   And your own observation of his teaching

20  was that it was average?

21    A.   Yes.

22    Q.   You didn't feel that he had any glaring

23  deficiency when you observed his teaching?

24    A.   From my observation?

25    Q.   From your observation?

LISA BERARDINO BY MR. ANDREWS

1     A.    Yes.

2     Q.    And you thought he was understandable?

3     A.    I am not going to say -- no.

4     Q.    Sufficient to be average in his

5    teaching?  You have said that you found his

6    teaching to be average based on your observation,

7    correct?

8     A.    Yes.

9     Q.    And you have said that you reported to

10   the College Wide Committee that your observation

11   of Doctor Zhou's teaching resulted in the

12   conclusion that it was average, correct?

13    A.    Correct.

14    Q.    So he did not have a language problem

15   that made his teaching below average; isn't that

16   also correct?

17    A.    I feel like you are putting words in my

18   mouth here.

19    Q.    I am, but you get to disagree with me if

20   you want?

21    A.    I am disagreeing with you.

22    Q.    Explain the source of your disagreement?

23    A.    What I am hearing is enough language to

24   understand most of what he is saying.

25    Q.    Enough so that you can consider his

LISA BERARDINO BY MR. ANDREWS

1  teaching based on your observation to be average?

2      A.    The understanding is enough to be

3  average.

4      Q.    Do you recall anything else about the

5  discussion of Doctor Zhou's application during

6  the second College Wide Committee meeting?

7      A.    Let's see, I recall discussion and I

8  recall the Committee trying to understand, the

9  Committee was making a good faith effort to try

10  to understand the issues.  That is what I recall.

11      Q.    So you don't recall anything more

12  specific than that?

13      A.    I just remember people asking questions

14  and wanting to understand.  That's what I

15  remember.

16      Q.    In making a good faith effort to come up

17  with a determination?

18      A.    Yes.

19      Q.    Are you familiar with the fact that

20  Doctor Zhou had research funding while he was a

21  professor at SUNY IT?

22      A.    No, I do not know that.

23      Q.    You don't recall that being a part of

24  his binder?

25      A.    I don't remember it, no.

166

LISA BERARDINO BY MR. ANDREWS

1   BY MR. ANDREWS:

2       Q.    I am not asking you anything you heard

3   from counsel.

4       A.    Then no.

5       Q.    That is just as a general matter.

6       A.    No.

7             MR. GOGLIA:   Thank you.   I

8             appreciate that.

9             MR. ANDREWS:   Sure.

10  BY MR. ANDREWS:

11      Q.    Did you know that Doctor Zhou had

12  complained about Doctor Langdon to SUNY IT

13  officials?

14      A.    Robert Yeh told me that there had been

15  some complaint.   So Robert Yeh said that there

16  had been some complaint.

17      Q.    When did Doctor Yeh tell you that?

18      A.    Before we reviewed the binder.

19      Q.    So was Doctor Petronio also present for

20  that conversation?

21      A.    No.

22      Q.    Do you recall where that took place,

23  that conversation?

24      A.    My office.

25      Q.    So the two of you were there?

LISA BERARDINO BY MR. ANDREWS

1    A.    Yes.

2    Q.    Do you recall why the two of you

3    happened to be meeting in your office?

4    A.    We were meeting to review the three

5    candidates.

6    Q.    So it was immediately before you

7    reviewed the binders; is that correct?

8    A.    Yes.

9    Q.    So in the same meeting where you

10   reviewed the binders?

11   A.    Yes.

12   Q.    What precisely did Doctor Yeh say?

13   A.    He said that there had been some episode

14   or something happened and that Jason Zhou had

15   gone to HR to complain about Will Langdon.

16   Q.    What else did he say about that?

17   A.    That's it.   That's it.

18   Q.    Did Doctor Yeh tell you why he was

19   telling you that?

20   A.    No.

21   Q.    Did you have an understanding as to why

22   he was telling you that?

23   A.    No.

24   Q.    Did you think that it should at all

25   impact your consideration of Doctor Zhou's case?

LISA BERARDINO BY MR. ANDREWS

1    Q.    You are saying the point is to get
2    students engaged, correct?
3    A.    Yes.  Not to lighten the load.
4    Q.    To use multimedia to get them to pay
5    attention, respond?
6    A.    Discuss, yes.
7    Q.    Now, you testified earlier that you were
8    present when Doctor Zhou did his presentation
9    when he was being interviewed.  Do you recall
10   that?
11   A.    I do recall.
12   Q.    Do you recall that he showed a video
13   during that?
14   A.    Very vague, very vague.
15   Q.    Do you recall anything about the video
16   at all?
17   A.    It had tennis balls.
18   Q.    Juggling maybe?
19   A.    Something with balls (indicating).
20   Q.    Making a juggling motion with two hands?
21   A.    Okay.  Something about balls moving.
22   Q.    After seeing the video you were not so
23   offended that he should not be hired; is that a
24   fair statement?
25   A.    That is a fair statement.

LISA BERARDINO BY MR. ANDREWS

1    Q.    I think you testified earlier that you
2    were told that there were complaints by students
3    about Doctor Zhou; is that correct?
4    A.    That is correct.
5    Q.    Who was it -- can you tell me who told
6    you about such complaints?
7    A.    Before the --
8    Q.    Let's start before the Peer Review
9    Committee meeting?
10    A.    Steve Havlovic told me about the
11    complaints.
12    Q.    That was primarily what he told you
13    about Doctor Zhou when you spoke before the Peer
14    Review Committee?
15    A.    My recollection is we reviewed that the
16    research was good.
17    Q.    So Doctor Havlovic said the research was
18    good?
19    A.    The research was in place.
20    Q.    What did he say about his service?
21    A.    I don't recall discussion of the
22    service.
23    Q.    Do you recall anything other than the
24    discussion of the research and the student
25    complaints?

LISA BERARDINO BY MR. ANDREWS

1     A.    That's what I recall.

2     Q.    Prior to the Peer Review Committee

3   meeting had you heard from anyone else that there

4   was complaints about Doctor Zhou's teaching?

5     A.    No.

6     Q.    Subsequent to the Peer Review

7   Committee's first meeting, but prior to the first

8   College Wide Committee meeting, did you speak to

9   anyone about complaints about Doctor Zhou by

10  students?

11    A.    I didn't speak to anyone about the

12  complaints.  In the school tenured faculty

13  meeting there was much discussion from many

14  people including all three coordinators that were

15  present about problems with Zhou's teaching and

16  there was discussion of student complaints at

17  that faculty meeting.

18    Q.    So the three coordinators were

19  Doctor Langdon, Doctor Orillio?

20    A.    And Doctor Gary Scherzer.

21    Q.    Scherzer, can you spell it?

22    A.    S-C-H-E-R-Z-E-R.

23    Q.    Again, what did Doctor Orillio say about

24  complaints about Doctor Zhou's teaching?

25    A.    He said that Zhou was aware of the

LISA BERARDINO BY MR. ANDREWS

1    higher number of foreign born MBA students in MBA

2    programs in the United States?

3        A.    I don't have that data.

4        Q.    Have you ever heard that suggested

5    before?

6        A.    You are saying many, are you giving a

7    percentage?

8        Q.    Do you have any idea what the proportion

9    is?

10       A.    I don't.

11       Q.    Do you have any idea what the proportion

12   is here at SUNY IT?

13       A.    We have about 200 MBA students and maybe

14   twenty foreign born.  I would go ten percent.

15       Q.    Okay.  Do you know who Professor Hoseoup

16   Lee is?

17       A.    Yes.

18       Q.    You are familiar with Professor Lee?

19       A.    Yes.

20       Q.    And he teaches here at SUNY IT?

21       A.    Yes.

22       Q.    And his native tongue is Chinese?

23       A.    I don't know.

24       Q.    Does he speak with a --

25       A.    There is an accent.

193

LISA BERARDINO BY MR. ANDREWS

1   Q.   A fairly thick accent?

2   A.   There is an accent.

3   Q.   How would you say it compares to

4   Doctor Zhou's accent?

5   A.   About the same.

6   Q.   You are familiar with the AACSB, I think

7   you mentioned it earlier?

8   A.   Yes.

9   Q.   Can you tell me what it stands for?  I

10  don't mean to quiz you.

11  A.   American Association of -- Business

12  School -- College Business, AACSB.  Collegiate

13  School Of Business.

14          MR. GOGLIA:  Do you want a

15          definition?

16          MR. ANDREWS:  That's okay.  If you

17          know off hand.  Do you want to make a

18          representation to what it stands for

19          Mr. Goglia?

20          MR. GOGLIA:  I will do my best.

21          It's stands for the Association to

22          Advance Collegiate Schools of Business.

23          MR. ANDREWS:  I think you did an

24          excellent job.

25          MR. GOGLIA:  Thank you.

LISA BERARDINO BY MR. ANDREWS

1    Q.    Have you seen this document before?

2    A.    No.

3    Q.    I would like to direct your attention to

4    the third paragraph?

5    A.    Okay.

6    Q.    The first sentence says materials

7    available in the Human Resources office clearly

8    indicate that Doctor Zhou's university service is

9    more extensive than indicated in the Peer

10   Committee recommendation?

11   A.    Okay.

12   Q.    Do you agree with that?

13   A.    Yes.

14   Q.    It next say his publications are more

15   impression than one might be led to believe from

16   the section of scholarly ability.  Would you

17   agree with that?

18   A.    Yes.

19   Q.    It makes a reference to grant funding.

20   Can you tell me why you didn't put more

21   information in the memorandum to the College Wide

22   Committee than you did relative to Doctor Zhou's

23   application?

24   A.    My focus as I drafted it was on the

25   teaching.