UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

XU-SHEN ZHOU, a/k/a JASON ZHOU,

               *Plaintiff*,                                 Civil Action No. 6:08-cv-444
                                                                                      (DNH/ATB)

   -against-

STATE UNIVERSITY OF NEW YORK INSTITUTE OF
TECHNOLOGY, DRS. LISA BERARDINO, STEPHEN
HAVLOVIC, WILLIAM LANGDON AND PETER
SPINA, personally and in their official capacities,

               *Defendants*.
-----------------------------------------------------------------

## PLAINTIFF'S DECLARATION IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      I, Dr. Xu-Shen Zhou, also known as Jason Zhou, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, on the date set forth below, that the following is true and correct:

      1.   I am the plaintiff in the above titled action. I make this declaration in opposition to defendants' motion for summary judgment.

      2.   In or about July, 2005 I applied for a tenure track position as a professor at the State University of New York Institute of Technology (SUNY IT) in the School of Business. As a part of the interview process I visited the campus, had multiple interviews, and did a demonstration of my teaching. As a part of my demonstration, I showed movies that I had prepared that related to the classes that I taught, which were seen by Dr. Berardino, Dean Havlovic, and others.

      3.   During the interview process, I truthfully and accurately answered all questions that were posed to me. Based upon my credentials, the interviews and my teaching demonstration, I was offered the position. I accepted the offer. I began working for SUNY IT in August, 2005. Defendant Langdon was my supervisor at the School of Business.

4. During my employment at SUNY IT, Langdon made repeated negative comments about China and persons of Asian origin in general. Langdon told me that he feared China. Langdon said he could not understand how Chinese people could work under horrible conditions, as if that is how most Chinese people live and as if no other nationality works under bad conditions. Langdon also said to me that China is a "Third World" country.

5. I did not receive notice of any complaints in my first semester at SUNY IT, nor did I discuss any such complaints during my first semester with Dean Stephen Havlovic. In fact, from the start of my employment by SUNY IT through the Fall, 2006 semester, the only complaints that I was informed of were two complaints which appeared shortly after I removed a student from class for inappropriate cell phone usage, and one other regarding students having to write on the blackboard, all in Spring 2006 semester.

6. On the other hand, I had received compliments about my teaching. For example, in April, 2006, Dr. Havlovic told me that some students talked to Dr. Robert Orillio saying good things about my teaching. Relatedly, at one point I invited Dr. Orillio to observe my classroom teaching, but Dr. Orillio never took me up on that offer. Similarly, I received many compliments on evaluations, including (but certainly not limited to): "I had fun taking this class and really learned a lot. I hope I have the opportunity to take another class with you. We should play ping pong sometime;" "One of the best, most caring teachers at SUNY IT, I hope to be in more classes with Dr. Zhou;" "I really enjoyed this course. Jason is a great teacher who made class fun;" "Jason is a very interesting character. The class is very hard but he makes it fun which takes some pressure off the students;" "This teacher seemed to really know what he was talking about and related the information to real life very well. I also felt like he wanted us to learn the material;" "Dr. Zhou was very willing to help students with problems and offered extended office

hours and extra help sessions;" "Jason was a wonderful professor who has a variety of teaching methods that enable him to teach all different learning styles. I really enjoyed his class immensely and would recommend taking him to anyone. I learned a lot that I have already applied to life;" "It was a good experience. I enjoyed and learned a lot about finance." *See Exhibit A hereto* (comments from Student evaluation forms that I received at SUNY IT).

7. It should be noted that all of the movies that I showed to students related to the particular course that the students were taking. It is true that I sometimes included material that was meant to keep students engaged, through humor and other devices. However, that is a common technique, used by professors at SUNY IT and elsewhere, and I have never heard of any other professor being criticized for showing such movies. The complaint about my videos that I was told about while I still worked for SUNY IT was made after the decision was made not to renew my contract. Contrary to the few complaints about my movies, I received many rave reviews about them.

8. While there were a few critical comments and complaints made about me, to my experience most professors receive some critical comments. In their motion papers, defendants continuously exaggerate both the number and the content of the complaints made against me. This is especially true if you consider the fact that the petition for a refund my third semester (which is the semester my renewal was denied) was made by a student who had to justify a late request to withdraw, *see Exhibit P hereto*, (which I was not told about until after my employment), and two complaints from my second semester arose after I dismissed a student from class for inappropriate cell phone usage.

9. Notably, despite my repeated requests, I was never allowed to meet with students whom allegedly presented complaints about me. This is a direct violation of SUNY IT policy,

which calls for the problem to be addressed with the faculty member. Specifically, the Academic Grievance Procedures states, "First, schedule a meeting with the faculty, staff, or administration member to discuss concerns. Every attempt should be made to resolve the potential grievance at this level." *See Exhibit B,* which is a proposal to change the SUNY IT student grievance procedure that I received while still employed by SUNY IT. While the document is a proposal, it clearly states the procedure in effect during the relevant time periods.

10. Additionally, during a faculty meeting in the spring of 2006, Defendant Havlovic reported that there had been an increased number of student complaints about the faculty. The School of Business Dean's secretary Ms. Carol Gargash told Dr. Sema Dube and myself that if a faculty member has student complaints, he/she will be notified. This policy was not followed as I was consistently not given specifics about complaints allegedly made. I was therefore deprived of the opportunity to defend myself and/or make any needed changes. Notably, there are three written complaints from prior to June/July 2006, at which time both Langdon and Havlovic told me that prior complaints were nothing to worry about and were closed issues. There was only one more complaint prior to the decision not to renew me, and that was the one by the student trying to justify his late withdrawal from a course.

11. On June 26, 2006, Langdon called me at home asking to see me the following day. At 10:00 am June 27, 2006, I walked to Defendant Langdon's office. Langdon said he did not want to talk in the office but would like to talk in his car. I said I would prefer to walk, and Langdon replied that he would like to walk too. I got into Langdon's convertible to drive to the other side of the campus where there are good places to walk. Langdon refused to stop at the other side of the campus at my request and continued to drive out of the campus, insisting that I go for a drive. I again asked Langdon to stop on Main Street in Whitesboro, but he refused again

and continued to drive further away from the campus.

12. During this car ride, Langdon told me that two students had complained "all the way to the President," but he reassured me that I should not worry because the students' complaints were "just the perception." Langdon said he had looked at my Stock Project instructions I had submitted for the Trading Room funding and found it to be very good. He said he had looked at my exam problems and said they were very solid. He said he also liked my trading game using casino chips.

13. Langdon continued stating that my teaching is rigorous. He said our finance department needed someone like me who could teach students the materials and skills so that they know how to use them when they get out of SUNY IT, unlike some other professors who do not teach the materials such that our finance students do not know anything when they graduate. Langdon said we also need someone who can do research like me.

14. Langdon claimed that Dean Havlovic wanted to remove me from teaching in the fall and had asked Langdon to write an email to Dean Havlovic requesting that I be removed. Langdon told me that they already had the replacements for me and had checked with human resources and determined that they could do that. Langdon said that my student evaluations were low, so I would have trouble getting reappointed. Langdon discussed my Green Card application, which was based on my job at SUNY IT. Langdon knew that the application would be in danger if I was not reappointed.

15. During the car ride Langdon said to me "Yesterday Tom Amlie called me, ... He also has those kinds of students at his school. But he is an American, you are from China, you can't say the things he says to students."

16. Langdon said he would not write the email to remove me from teaching and offered

to be my advocate in my reappointment application in exchange for me producing a journal publication for him before the end of summer. Langdon said Laura (Francis-Gladney) also had low teaching evaluations, but that he was her advocate, so she got reappointed. He said he would be my advocate and I would get reappointed. Langdon said "if you fail, I fail and I won't let myself fail." We never discussed any need to change my teaching or how to do so.

17. I felt extremely intimidated by these many veiled threats. I agreed to help Langdon with his bond paper. In order to produce a journal publication for Langdon within two months, I suggested that Langdon be the co-author of a paper being written by Dr. Rafael Romero and I. Eventually, Langdon let me out of the car.

18. Shortly after the car ride, Dr. Langdon did call me, to ask if he could be a co-author with Dr. Romero and myself on a paper we were preparing. Dr. Langdon did not mention student complaints or alleged deficiencies in my teaching during that call. In fact, the only complaints that I was informed of after the car ride were made in the Spring of 2007 after the decision not to renew my appointment had been made. Notably, I was never told of any complaints regarding my classroom demeanor.

19. After speaking again to Langdon, I decided to complain of discrimination. I had been told that Langdon had similarly targeted two Asian born faculty members, Drs. Sanjay Varshney and Robert Yeh, to intimidate them into doing things they had the right not to do and listing him as a coauthor on papers Dr. Yeh produced. I also thought I was being discriminated against because Langdon had indicated during the car ride that I could not respond to student misconduct like an American born professor could, suggesting that as a Chinese/Asian person I was vulnerable to unfounded student complaints. I also was told that the conduct towards Drs. Varshney and Yeh had been reported to the officials at SUNY IT. I thought that it was my

responsibility to report this further conduct.

20. SUNY IT's Faculty Handbook states, "There is a separate procedure used for grievances in matters relating to discrimination, including sexual harassment. For information about these procedures, contact the Assistant Vice President for Human Resources." *See Panebianco Declaration Exhibit B, p. 3*.

21. On or about June 29, 2006 I complained about Langdon's conduct to Associate Vice President for Human Resources Anthony Panebianco. I told Panebianco about Langdon's conduct, made clear that I had felt very intimidated, and told him that Langdon had targeted other Asian faculty in the past to try to get them to list him on their papers. I do not recall if I used the word discrimination but I made clear that I thought that Langdon was targeting me because I was Asian consistent with his past actions. Panebianco did not inform me of or give me access to any complaint procedure, and after I complained of discrimination to him, he never followed up with me.

22. On June 30, 2006, I told Langdon that I could not list him as a co-author on my paper because it was due the next day. I told him that I would still help him with statistics and data for his bond paper.

23. On or about July 6, 2006 I had a meeting with Dean Havlovic. I asked Havlovic about Langdon's claim that there had been student complaints against me. Havlovic told me there had been just a few but they were closed issues. I then complained to Dean Havlovic of Langdon's discriminatory and harassing conduct. I essentially told him the same thing that I had told Anthony Panebianco. When I insisted that I wanted to file a complaint against Langdon Havlovic's demeanor changed for the worse.

24. My contract was up for renewal in the Fall of 2006. I compiled a very detailed

binder listing my qualifications and accomplishments to be used in that process.

25. In the Fall of 2006 I reviewed the contents of my personnel file that was, in addition to the binder, being used in the renewal process. As of that time, there were no student complaints contained in my personnel file.

26. The renewal process as I understand it was as follows: the three member School of Business Personnel committee [hereinafter "Personnel Committee"] organized candidates' materials, reviewed them and made a recommendation to the School Business Peer Review Committee [hereinafter "Peer Review Committee"], which consisted of tenured faculty from the School of Business; the Peer Review Committee reviewed the candidates and sent a recommendation to the College Wide Academic personnel Committee [hereinafter "College Wide Committee"], which consisted of tenured faculty members across the different schools and areas of SUNY IT; The College Wide Committee reviewed the candidates and sent a recommendation to the Vice President, who also received a separate letter from the Dean of the relevant school within the College; the Vice President then transmitted a recommendation to the President, who also reviewed the other recommendations.

27. Dr. Lisa Berardino, Associate Professor for the Department of Business, along with two other professors, Robert Yeh and Ed Petronio, served on the Personnel Committee.

28. I received notice by memorandum dated October 31, 2006, from the Personnel Committee to Dean Havlovic, that the Personnel Committee had recommended me for a one year reappointment but that recommendation had been rejected 6-2 by a vote of the Peer Review Committee. *See Exhibit C.* I feared that Dr. Langdon, who would play a large role in the deliberations of that committee, was retaliating against me because of my complaint of discrimination. I also feared that Dean Havlovic might be playing a role in the retaliation.

29. I received a memorandum dated November 15, 2006, from the Peer Review Committee to the College Wide Committee stating that my application for renewal had been rejected 6-2 by a vote of the Peer Review Committee. *Exhibit D.* It did not mention that the Personnel Committee had recommended me for a one year reappointment. Notably, the memorandum was initialed by only two of the three members of the Personnel Committee (with Dr. Robert Yeh not having signed). It gave a summary of my accomplishments in only four of the five criteria that were supposed to be considered and the information provided was very meager as compared to the information that I had provided in my portfolio.

30. I received a copy of another memorandum dated November 15, 2006, from Dean Havlovic to Interim Vice President Rosemary Mullick. *Exhibit E.* The memorandum stated that I should not be renewed purely based on my teaching performance.

31. Dr. Berardino does not teach or have experience in my area of expertise, finance. Nevertheless, during the renewal process, she took it upon herself to observe my teaching of a finance class. Prior to Berardino's twenty minute observation of a class I was teaching, no faculty member or administrator from the School of Business had ever observed me while I taught during my employment by SUNY IT.

32. By memorandum dated November 21, 2006, by a vote of 4-1, the College Wide Committee recommended to VP Mullick that I be reappointed for one year. The memorandum explained:

> The ... recommendation is based on the *paucity and non-representativeness* of the information provided in the Peer Review Committee recommendation, ... and also on prior personnel decisions in which the candidate was renewed...

*See Exhibit F* (emphasis provided). The memorandum continued:

> Materials available in the Human Resources Office clearly indicate that Dr. Zhou's

> University Service is more extensive than indicated in the peer committee recommendation. His publications are more impressive than one might be led to believe from the section on Scholarly Ability. He has obtained grant funding, which is also not mentioned. The [College Wide Committee] believes that Dr. Zhou's IDEA rating or 4.2 for teaching excellence in one of his courses is evidence of his potential as an instructor.

*Id.* The memorandum concluded:

> In the past, faculty members who have shown promise but who have struggled in the classroom have been coached on teaching technique, diction, etc. The [College Wide Committee] recommends that the university give the same consideration to Dr. Zhou.

*Id.*

33. In spite of the College Wide Committee's recommendation, Mullick recommended to interim President Spina that I not be renewed, incorrectly stating that the Personnel Committee had recommended against me being reappointed and otherwise relying only on Dean Havlovic. *Exhibit G.*

34. In turn, Spina concurred with Mullick and Havlovic. I was given notice that my employment was being terminated by letter dated December 11, 2006.

35. A comparison of the memoranda prepared by Berardino for the three School of Business candidates reveals that far more detail was provided for the other two than for me (the memoranda prepared for me is Exhibit D above). Exhibits H and I are the memoranda for Drs. Kimberly Jarrell and Maureen Smith-Gaffney, respectively, which I received from defendants during the discovery process. For the first criteria, "Mastery of Subject Matter," it states that I have a Ph.D. but the school I received it from is not listed and none of my other degrees (including a Masters and a Bachelor's) are listed. Dr. Berardino knew that it was important to list those things. For Jarrell and Smith-Gaffney, all degrees and the granting institutions are listed. For "Scholarly Ability," which defendants admit is a strong area for me, the memo says that a list of my publications and presentations "is available in the human resources office." The

other two candidates' publications and presentations are all listed. Relative to "Effectiveness in Teaching" Smith-Gaffney's memo says she "received good teaching evaluations based on the IDEA (e.g., 3.7 for teaching excellence)," ignoring the fact that she received many lower scores. For me, the memo listed my lowest scores and only begrudgingly admitted that I had received a 4.2 for teaching excellence (higher than Smith-Gaffney's highest rating). Moreover, the average of my four ratings, 2.85, is higher than that of the Smith-Gaffney's, 2.65. This is easily demonstrated as my adjusted undergraduate ratings are 2.1, 2.5, 2.6, and 4.2. *See Exhibit D.* The corresponding adjusted undergraduate ratings of Dr. Smith-Gaffney are 1.5, 2.4, 3.0, and 3.7. *See Exhibit J.* Additionally, negative evaluation comments for me are mentioned, but not Gaffney's. The other two candidates also have more detailed discussions for University/ Community Service, a criteria for which most of my service was ignored. Finally, the other two candidates are positively reviewed for their "Continuing Growth," whereas that criterion is entirely omitted from my memo. It is clear to me that Berardino, with Havlovic and Langdon's guidance, were attempting to sabotage my chances with the College Wide Committee.

36. Langdon's extraordinary efforts to block my renewal are also evidenced by the fact that Berardino solicited Langdon to provide separate, direct input to the College Wide Committee after that body rejected Berardino's first memorandum. The renewal process at SUNY IT does not include any provision allowing such input from a professor or area coordinator. Berardino admitted in her deposition that she personally distributed the letter that Langdon prepared to the College Wide Committee members.

37. During the summer of 2009, I saw and spoke to Ray Pfeiffer, one of the students who had made a complaint about me, at a local Walmart. Pfeiffer told me that around April 2006, Langdon told Pfeiffer and student Jeffrey Trapp to gather other students to make

complaints against me. When Trapp and Pfeiffer went to the president's office, President Spina told them to go back to Defendant Langdon.

38.     I far exceeded other faculty in the development of devices for teaching finances, including one for which a U.S. patent has been approved. This extraordinary teaching achievement was not regarded as the evidence of teaching improvement by the defendants. Further, proper consideration was not given to my excellent syllabi and course development.

39.     During the discovery process for this litigation, I sought information regarding multiple non-Asian comparators. When defendants resisted, Magistrate Judge DiBianco limited their responses, in large part, to one professor who was being considered at the same time as me, Dr. Smith-Gaffney. *See Order dated November 9, 2009, Docket Entry 49.* During the proceedings before Judge DiBianco, defendants never stated that Dr. Smith-Gaffney was ill prior to the renewal process in the Fall of 2006. In fact, it is my understanding that she became ill long after that process was complete and after she left SUNY IT in the end of 2008.

40.     While I believe that things that happened after Spina decided not to renew my contract are irrelevant, I feel compelled to respond to allegations made by defendants about me relative to the Spring of 2007. Specifically, that semester I was removed from teaching. Defendants suggest that many student complaints came in during this time period, justifying that drastic action. However, defendants' own documents tell a different story. Specifically, on February 1, 2007, a student talked to Defendant Havlovic about his concerns of passing my course which he needed to graduate. Apparently Defendant Havlovic requested the student to send him a complaint letter and promised him that he will not reveal the student's name to me. *See Exhibit K.* On February 2, 2007, in less than an hour after receiving the requested letter, Havlovic sent a request to remove me from the course to the president and vice president with a

copy to Human Resources, Drs. Langdon and Orillia. *Exhibit L*. Notably, that was before Defendant Havlovic talked to me regarding the student's concerns on February 5, 2007. *Exhibit K*.

41.     Within an hour, Havlovic received approval from Dr. Mullick who assumed that everything the student said is "accurate," again, without any opportunity for me to respond. *Exhibit M*. Again within an hour, Havlovic decided to remove me from teaching by preparing a replacement *Exhibit M*. After receiving another email from the student on February 19, 2007, Havlovic wrote, "you and your classmates will need to send a formal complaint or petition to Dr. Rosemary Mullick, Interim V.P. of Academic Affairs. If you choose to submit a formal complaint or petition, I would recommend doing so in writing and include signatures of all the students involved with the complaint or petition." *Exhibit N*. Therefore, prior to the Dean soliciting the student to recruit other students to complain, there was a grand total of one student complaint in 2007. Also, the additional solicited complaints were not received until after the decision was made to remove me from teaching. These events clearly suggest that Dean Havlovic was further retaliating against me.

42.     While I believe that my prior work at Bloomsburg University is irrelevant to this proceeding, it should be noted that my student teaching ratings improved significantly during my final year at Bloomsburg University such that I met the tenure requirement in teaching by the time I left. Notably, none of the cited complaints arose during my final year. Additionally, given the rigor of the interview process at the time I was hired by SUNY IT, the speculation that I would not have been hired had defendants known of my teaching history at Bloomsburg is not credible.

43.     If the Court does consider my performance at Bloomsburg, it should also be noted

that defendants failed to note that, unlike SUNY IT, Bloomsburg did formal teaching observations of my classes. The conclusion reached by one reviewer was that "this was a good class, and Dr. Zhou showed he had a command of the classroom and a good pedagogical approach to moving the students through the day's assignment." *See Exhibit O.*

44. Finally, I note that there were only two Chinese faculty members from the People's Republic of China (Dr. Charles Shi was the other such professor) during my employment at SUNY IT, and we were both non-renewed within a period of several months. At the end of 2007, there were no full-time Chinese faculty members from the People's Republic of China at SUNY IT.

45. I respectfully request that Defendants' motion for summary judgment be denied.

Dated: November 22, 2010

_____
Xu-Shen (Jason) Zhou