UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――

XU-SHEN ZHOU, a/k/a JASON ZHOU,

                    Plaintiff,                    6:08-CV-0444
                                                  (GTS/ATB)
v.

S.U.N.Y. INST. OF TECH.; DR. LISA
BERADINO; DR. STEPHEN HAVLOVIC;
DR. WILLIAM LANGDON; and
DR. PETER SPINA, personally and
in their official capacities,

                    Defendants.

―――――――――――――――――――――――

APPEARANCES:                          OF COUNSEL:

SATTER & ANDREWS LLP                  ROSS P. ANDREWS, ESQ.
  Counsel for Plaintiff
217 South Salina Street, 6th Floor
Syracuse, New York 13202

HON. ERIC. T. SCHNEIDERMAN           CHRISTINA L. ROBERTS-RYBA, ESQ.
Attorney General for the State of New York   DOUGLAS J. GOGLIA, ESQ.
  Counsel for Defendants              SUSAN C. VON REUSNER, ESQ.
The Capitol
Albany, New York 12224

HON. GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

        Currently before the Court, in this employment discrimination action filed by Xu-Shen

Zhou ("Plaintiff") against the State University of New York Institute of Technology, Dr. Lisa

Berardino, Dr. Stephen Havlovic, Dr. William Langdon, and Dr. Peter Spina ("Defendants"), is

Defendants' motion for summary judgment.  (Dkt. No. 69.)  For the reasons set forth below,

Defendants' motion is granted, and Plaintiff's Amended Complaint is dismissed.

I.       RELEVANT BACKGROUND

A.       Plaintiff's Claims

Generally, liberally construed, Plaintiff's Amended Complaint alleges that Plaintiff, a

person of Chinese nationality and origin, was subject to discrimination during his employment at

the State University of New York Institute of Technology ("SUNY IT").  (*See generally* Dkt.

No. 28 [Plf.'s Am. Compl.].)  More specifically, Plaintiff alleges as follows.

Beginning in August 2005, Defendant Langdon, who was Plaintiff's supervisor, harassed

and intimidated Plaintiff by (1) making "repeated negative comments about China and persons of

Asian origin," (2) seeking "to have plaintiff do the work for a scholarly publication but include

Langdon's name [on that publication]," (3) "encourag[ing] students to make complaints against

plaintiff," (4) telling Plaintiff that he could assist Plaintiff with student complaints "if plaintiff

helped [him] get a paper published," (5) "unfairly criticizing plaintiff's teaching," (6) "behaving

in a menacing manner," and (7) "recommending against plaintiff's reappointment."  (*Id.*)

Plaintiff complained about Defendant Langdon's behavior to human resources on June 29, 2006,

and to Defendant Havlovic on July 6, 2006.  (*Id.*)  Defendant Berardino also "knew of Plaintiff's

complaints of unlawful discrimination."

During Plaintiff's meeting with Defendant Havlovic, Defendant Havlovic "assured

Plaintiff that the complaints that had been made by a few students about Plaintiff was a closed

issue."  (*Id.*)  After this meeting, Defendant Havlovic "began to exaggerate the import of those

student complaints . . . and opposed plaintiff's reappointment."  (*Id.*)

Despite Plaintiff's complaints, SUNY IT "failed or refused to take appropriate action to

remedy the hostile working environment."  (*Id.*)  Instead, Defendants "retaliated against plaintiff

[by] . . . refusing to renew his employment contract." (*Id.*)  Defendant Spina also "stated in front of faculty members 'We do not want foreigners' or words to that affect"; and it was her decision not to recommend Plaintiff for reappointment that lead to his termination. (*Id.*)

Based on these (and other) factual allegations, the Court liberally construes Plaintiff's Amended Complaint as asserting the following three claims: (1) a claim of national origin and/or race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), 42 U.S.C. § 1981, and Section 292 of the New York State Human Right's Law ("NYHRL"); (2) a claim of hostile work environment based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL; and (3) a claim of retaliation based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL. (*Id.*)  Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B.      Undisputed Material Facts**

The following material facts are not in dispute. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 78, Attach. 7 [Plf.'s Rule 7.1 Response].)

**1.      Plaintiff's Initial Employment with SUNY IT**

SUNY IT is a college within the educational system of New York State.  In or around July 2005, Plaintiff applied for a position at SUNY IT to teach finance as a faculty member in the School of Business.  Plaintiff was initially interviewed over the telephone, and was subsequently interviewed in person during a campus visit.  When Plaintiff was interviewing at SUNY IT, he did not disclose that he had received complaints from students about his teaching at Bloomsburg University.

3

On July 19, 2005, Dr. Peter Spina, the Interim President at SUNY IT, sent to Plaintiff an initial offer of employment, which was contingent upon official notification from the U.S. Citizenship and Immigration Services that Plaintiff had authorization to work at SUNY IT. Plaintiff's employment was scheduled to begin on September 1, 2005, and the offer was for a two-year appointment.  Dr. Steven Havlovic, Dean of the School of Business and tenured Professor of Human Resource Management, endorsed the hiring of Plaintiff.

Sometime after Plaintiff began teaching at SUNY IT, students in his class made complaints about him.  During the summer of 2006, Plaintiff went on a car ride with Dr. Langdon, a full professor at SUNY IT who served (with all the tenured professors in the School of Business) on the School of Business Review Peer Committee.  During the car ride, Dr. Langdon explained to Plaintiff that he and Dean Havlovic had received complaints regarding Plaintiff's teaching style.  Dr. Langdon also told Plaintiff that he and another professor were working on a research project, and indicated that he could use Plaintiff's help.

Shortly after the car ride, Dr. Langdon called Plaintiff, who informed Dr. Langdon that he was not interested in working on the research project.  Plaintiff also contacted Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, to complain about the car ride.  Dean Havlovic advised Plaintiff that he was not required to work on papers that he did not wish to work on.  Dean Havlovic subsequently contacted Dr. Langdon, and instructed Dr. Langdon not to take employees on car rides.

During the fall of 2006, Dr. Langdon was contacted by Dean Havlovic, who informed Dr. Langdon that he had received additional complaints regarding Plaintiff's teaching.  By the same point in time, Dr. Langdon also had received written complaints from students regarding Plaintiff's teaching.  One student requested to withdraw from Plaintiff's class on account of

4

Plaintiff's limited English language skills.  The student stated, "I cannot comprehend [Plaintiff because he] speaks very broken English and most of my class has no idea what he is saying."

### 2.        Plaintiff's Application for Renewal

Also during the fall of 2006, Plaintiff's teaching contract was up for renewal.  Plaintiff, along with two other candidates, put in applications for two-year renewals.  As Dean of the School of Business, Dr. Havlovic sent Plaintiff a memorandum outlining the steps for renewal. The memorandum included a recommended timetable for the Personnel Actions.  The memorandum stated that faculty members who were being reviewed would be notified by the appropriate Dean and instructed to complete and/or update their personnel files.  Those who wished to have an advocate needed to send the notification by a certain date.  The memorandum also outlined the committees that were set up for the review process.

Prior to the President of SUNY IT making a final decision on renewal or non-renewal of a faculty member, it is SUNY IT's practice to receive recommendations from the School's Personnel Committee, the College-Wide Personnel Committee, the Dean, and the Vice President for Academic Affairs.  Dr. Lisa Berardino, Associate Professor for the Department of Business, along with two other professors, Robert Yeh and Ed Petronio, served on the School of Business Personnel Committee (hereinafter "Personnel Committee").  The Personnel Committee served to coordinate the faculty review of professors who are up for employment renewal on behalf of the School of Business Peer Review Committee (hereinafter "Peer Review Committee").  The guidelines that govern the review of professors that are up for renewal are entitled "The State University of New York Policies of the Board of Trustees."

### 3.   Personnel Review Committee's Evaluation, Recommendation and Subsequent Action

Pursuant to SUNY IT guidelines regarding the renewal of faculty members, the Personnel Committee was required to organize the three candidates' materials, review them, and ultimately make a recommendation to the Peer Review Committee.  Before making their recommendation, Dr. Yeh and Dr. Berardino met to discuss the review of the three candidates.  Although Mr. Petronio was invited to the meetings, was a part of the Personnel Committee's recommendation, signed the Personnel Committee's letters, and as was kept informed by Dr. Berardino as to the status of the review process, he was not present for the meetings because he was traveling during most of the review period.

With regard to the standard of review pertaining to the contractual renewal determination, the following five criteria were considered: (i) the candidate's terminal degree; (ii) the candidate's teaching ability and effectiveness; (iii) the candidate's research; (iv) the candidate's university service; and (v) professional development.  Under normal circumstances, professors are renewed for two years if the review results in a determination that the candidate is meeting the relevant criteria.

To ascertain effectiveness in teaching, among other things, the Personnel Committee reviewed each candidate's Individual Development and Educational Assessment scores (hereinafter "IDEA").  The IDEA rating system allows students to rate professors by soliciting feedback and evaluating teaching.  The scale for IDEA scores goes from one-to-five.  A score of one is very bad while a score of five is great.  The Personnel Committee also considered a portfolio, put together by the candidate, with information from his or her perspective on each of these categories, along with written complaint from students (if any).

Plaintiff's IDEA scores were not great.  In addition, Plaintiff had received written complaints from students.  Nonetheless, Dr. Berardino visited with Ken Wallace, Plaintiff's advocate, and told him that the Personnel Committee was planning to propose a one year renewal.  Mr. Wallace indicated that was fine.  The Personnel Committee then recommended to the Peer Review Committee that Plaintiff be renewed for one year.

**4.     Peer Review Committee's Evaluation, Recommendation and Subsequent Action**

The Peer Review Committee, which consisted of eight tenured professors from the business department, met to review the recommendation made by the Personnel Committee.  Dr. Berardino was also part of the Peer Review Committee.  At the meeting, Robert Orilio, the Undergraduate Coordinator, and William Langdon, the Coordinator of Finance, each expressed his concerns about Plaintiff's inability to teach undergraduate students.  A discussion ensued about how the students were being harmed and how they were not learning.  Ultimately, the Peer Review Committee rejected the recommendation for a one-year renewal in a vote of 6-2.  The rejection of the appointment was based on Plaintiff's weak IDEA evaluations, student complaints, and the comments by coordinators Will Langdon and Dr. Robert Orilio.  Dr. Berardino was one of the six faculty members to vote not to renew Plaintiff for a one-year term.

After the Peer Review Committee voted against renewing Plaintiff's contract, the Personnel Committee was required to send this recommendation to the College-Wide Academic Personnel Committee (hereinafter "College-Wide Committee"), which consisted of tenured faculty members across the different schools and areas of SUNY IT.  Dr. Berardino prepared a draft memorandum that she circulated by email message to the other two members of the Personnel Committee for their review.  The memorandum was then printed, circulated to the

three members of the Personnel Committee for their signatures, and sent to the chair of the

College-Wide Committee.  Dr. Havlovic also received a copy of a memorandum, dated October

31, 2006, which stated that, although the Personnel Committee had recommended a one-year

renewal of Plaintiff's application, the Peer Review Committee had rejected the appointment by a

vote of 6-2.

### 5.    College-Wide Committee's Evaluation and Recommendation

After the Peer Review Committee sent the recommendation of non-renewal to the

College-Wide Committee, the College-Wide Committee held a meeting, which resulted in a

request that Plaintiff's letter, along with the letters for other candidates, be revised.  With respect

to Plaintiff, the College-Wide Committee asked for more information about the student

complaints and Plaintiff's teaching performance.

Dr. Berardino followed up on the instructions of the College-Wide Committee by

emailing requests for more information to Dean Havlovic, Ken Wallace, Robert Orilio, and Will

Langdon.  Specifically, Dr. Berardino requested more information about Plaintiff's teaching

performance.  The Dean indicated the he would be sending his own letter to the Interim

Vice President of Academic Affairs, Rosemary Mullick.

Dr. Berardino also sent an e-mail message to each of the three candidates, and asked

them to help with the memorandum that the Personnel Committee would be sending to the

College-Wide Committee.  Plaintiff responded to the e-mail message by providing a small

amount of background information.

On November 14, 2006, Dr. Berardino submitted a revised letter on behalf of the

Personnel Committee to the College-Wide Committee.  On November 15, 2006, Dr. Langdon

prepared a letter to the College-Wide Committee detailing his concerns about Plaintiff's

teaching.  In the letter, Dr. Langdon stated, in part, that "[Plaintiff's] difficulties speaking the English language preclude his effectively communicating with students in a class room setting." In addition, he wrote, "to recommend [Plaintiff] for reappointment would, in my opinion, render a great disservice to students in the School of Business as well as to Dr. Zhou.  His research interest and productivity would potentially be more fully utilized, and more fulfilling to all parties involved, at an institution less oriented to teaching."

After receiving these letters, the College-Wide Committee met again.  At this second meeting, Robert Yeh informed the College-Wide Committee members that William Langdon had a personal conflict with Plaintiff, which effected the information Langdon provided.  During their meeting, the College-Wide Committee asked Dr. Berardino (who was a member of the College-Wide Committee) about her observation of Plaintiff's teaching.  Dr. Berardino reported Plaintiff's teaching as "average."  The College-Wide Committee ultimately voted 4-1 not to support the Peer Review Committee's vote for non-renewal of Plaintiff's application.  Dr. Berardino was the member of the College-Wide Committee who voted against the renewal.

**6.     Vice President Mullick's Evaluation and Recommendation**

On November 15, 2006, in response to Dr. Berardino's request for more information about Plaintiff's teaching, Dean Havlovic sent a letter to Dr. Mullick, which stated, in part, that Plaintiff continued to struggle as a finance instructor, that his teaching ratings for his undergraduate courses declined from a 3.1 average in the fall of 2005 to an average of 2.4 in the spring of 2006, and that, as a result, he concurred with the recommendation of the School of Business tenured faculty that Plaintiff's contract not be renewed.

After receiving the memorandum from Dean Havlovic regarding Plaintiff's renewal, Dr. Mullick had conversations with Dean Havlovic, who discussed his level of concern regarding the

9

student complaints about Plaintiff's teaching.  During their conversations, Dean Havlovic

referred to email messages from students, as well as petitions, where students asked to be

removed from the class and reimbursed.

Based on Dr. Mullick's personal review of Plaintiff's file, the student complaints, and the

recommendations of non-renewal by the Dean and the tenured faculty in the School of

Business, Dr. Mullick recommended that Plaintiff not be reappointed as Assistant Professor

of Finance.  She sent her recommendation to the Interim President, Dr. Peter Spina, in a

memorandum dated November 27, 2006.  Dr. Mullick's recommendation not to renew Plaintiff

was based entirely on the information that she received regarding Plaintiff's inability to

effectively teach the students at SUNY IT.

### 7.      President Spina's Decision

In a letter dated December 11, 2006, Dr. Spina informed Plaintiff that his "term

appointment" as Assistant Professor of Finance at SUNYIT would be terminated on August 31,

2007.  Dr. Spina's decision not to renew Plaintiff's contract was based in large part on the

recommendation of Dr. Mullick.  Dr. Spina also heavily relied upon the recommendation from

Dean Havlovic, who eventually removed Plaintiff from teaching in his final semester, replacing

him with another professor.

### 8.      SUNY IT's Discrimination Complaint Procedure

SUNY IT has a Discrimination Complaint Procedure that was in place prior to, and

during, Plaintiff's entire term of employment with SUNY IT.  The procedure is available to all

SUNY IT students, employees and to the public on the school's web page.  The procedure

"provides a mechanism through which the University may identify, respond to, and prevent

incidents of illegal discrimination."  The procedure requires employees to "file a written

10

complaint with the affirmative action officer within 90 calendar days following the alleged discriminatory act or the date on which the complainant first knew or reasonably should have known of such act."

SUNY IT also has a faculty handbook, which is available through the college's website. The handbook also states how to file a complaint based on discrimination.

While at SUNYIT, Plaintiff had access to the Discrimination Complaint Procedure.  In addition, Plaintiff had access to the faculty handbook.  However, throughout his employment at SUNY IT, Plaintiff never filed any formal complaints regarding discrimination or any other matter.  The only time Plaintiff discussed any concern with Mr. Panebianco was after the car ride with Dr. Langdon, and Plaintiff never went back to Mr. Panebianco's office to follow up on the one conversation they had.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.  (*Id*.)

   **C.   Defendants' Motion**

Generally, in support of their motion for summary judgment, Defendants argue, *inter alia*, as follows: (1) Plaintiff's claim of discrimination based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin and/or race was not a factor that motivated Defendants' employment actions; (2) Plaintiff's claim of hostile work environment based on race and/or national origin should be dismissed because the record shows that Plaintiff never formally complained of a hostile work environment, and one isolated incident does not establish a hostile work environment; (3) Plaintiff's claim of retaliation based on race

11

and/or national origin should be dismissed because the record shows that Plaintiff's national

origin and/or race was not a factor that motivated Defendants' employment actions; (4)

Plaintiff's discrimination and retaliation claims should be dismissed, in the alternative, because

SUNY IT had a discrimination policy in effect that was available to all faculty at the time

Plaintiff was allegedly discriminated against, and Plaintiff unreasonably failed to follow that

policy; and (5) Plaintiff's request for compensatory damages, back pay, or front pay should be

dismissed, in the alternative, pursuant to the "after-acquired evidence doctrine" because the

record shows that, had Defendants been aware of Plaintiff's poor teaching ratings at Bloomsburg

University during the hiring process, Plaintiff never would have been offered employment.  (*See

generally* Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law].)

       In response to Defendants' motion for summary judgment, Plaintiff argues, *inter alia*, as

follows: (1) his claim of discrimination based on race and/or national origin should not be

dismissed because he has (a) established a prima facie case of discrimination, and (b) adduced

record evidence from which a rational factfinder could conclude that Defendants' purported non-

discriminatory reason for not renewing his employment contract is pretextual; (2) his claim of

retaliation based on race and/or national origin should not be dismissed because he has (a)

established a prima facie case of retaliation, and (b) adduced record evidence from which a

rational factfinder could conclude that Defendants' purported non-discriminatory reason for not

renewing his employment contract is pretextual; and (3) Defendants arguments that they are

entitled to a "same actor" presumption, and that the "after acquired evidence" and *Farragher

Ellert* defenses apply, are without merit.  (*See generally* Dkt. No. 78, Attach. 5 [Plf.'s Reply

Memo. of Law].)

In reply to Plaintiff's response, Defendants (in addition to reiterating previously advanced arguments) argue, *inter alia*, that the Court should disregard the several qualifying statements provided by Plaintiff in his Rule 7.1 Response.  (*See generally* Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B.    Legal Standards Governing Plaintiff's Claims

Again, because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties.  (Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law]; Dkt. No. 82 [Defs.' Reply Memo. of Law].)

III.    ANALYSIS

    A.    **Plaintiff's Claim of National Origin and/or Racial Discrimination Under Title VII, Section 1981, and the NYHRL**[1]

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's discrimination claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that the non-renewal of his employment contract was discriminatory.  Based on the current record, the Court agrees with Defendants.

Claims of national origin and/or racial discrimination are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  "Under the burden-shifting rules set forth in *McDonnell Douglas* . . . , a plaintiff has the initial burden of making out a prima facie case of discrimination."  *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001).  For purposes of a Title VII disparate treatment claim, a plaintiff may do so by demonstrating "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 [2d Cir. 2002]).  The plaintiff's burden of establishing a prima facie case for discrimination "is not onerous . . . . [but] serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).

---

[1]    "Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the NYHRL."  *Ayton v. Lenox Hill Hosp.*, 93-CV-6601, 1997 WL 10000, at *1 n.1 (S.D.N.Y. Jan. 9, 1997) (collecting cases).

"If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Farias*, 259 F.3d at 98. "The defendant is not required to prove that the articulated reason actually motivated its actions." *Id.* "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

"If the defendant bears its burden of production, the presumption drops out of the analysis . . . and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Farias*, 259 F.3d at 98 (quoting *James*, 233 F.3d at 154). "Evidence that the defendant's articulated nondiscriminatory reason is false, when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference that prohibited discrimination occurred' and warrant submitting the case to the jury." *Id.* (quoting *James*, 233 F.3d at 156).

Here, with regard to the first and third above-described prongs, it is undisputed that (1) Plaintiff is a member of a protected class, and (2) his employment contract was not renewed.[2]

As for the second prong, Plaintiff has adduced record evidence from which a rational factfinder could conclude that he was qualified for the position he held. In fact, Defendants hired Plaintiff, who previously taught at a different University, instead of other applicants; and Dean Havlovic endorsed Plaintiff's hiring.

_____

[2]     The Court agrees with Plaintiff that "non-renewal of an employment contract constitutes an adverse employment action for purposes of Title VII." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 500-501 (2d Cir. 2009).

As for the fourth prong, even when viewing the facts in the light most favorable to Plaintiff, based on the admissible evidence in the record, a rational factfinder could not conclude that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination.  At best, the record establishes that Defendant Langdon had a conflict with Plaintiff, and that, as a result of this conflict, he voted against recommending Plaintiff for renewal and attempted to influence other faculty members to do the same.  However, even viewing the evidence in the record in a light most favorable to Plaintiff, there is no evidence from which a rational factfinder could conclude that this conflict was based on Plaintiff's national origin and/or race.  This is because the only evidence in the record regarding Defendant Langdon and Plaintiff's national origin and/or race is as follows: (1) a declaration from Plaintiff that Defendant Langdon made general comments about fearing people of Chinese descent and China being a "Third World Country" in Plaintiff's presence (Dkt. No. 78, Attach. 3, at ¶ 4); (2) testimony from Plaintiff that Defendant Langdon told him that he could not speak to students in the same manner as Tom Alee, an American-born professor, because Plaintiff is Chinese (Dkt. No. 69, Attach. 14, at 151); and (3) testimony from Plaintiff that Defendant Langdon previously "intimidated" two Asian faculty members (Dkt. No. 69, Attach. 14, at 179).

With regard to Plaintiff's declaration about Defendant Langdon's general comments regarding China and Chinese people, those comments are vague, without context, and insufficient to establish animus toward Plaintiff.  With regard to Plaintiff's testimony that Defendant Langdon "intimidated" two other Asian faculty members, that testimony was both vague and based on hearsay.  Finally, with regard to Plaintiff's testimony that Defendant Langdon made a statement about an American-born professor being able to "say" things to his

16

students that Plaintiff cannot "say," it was at best ambiguous, and at worst evidence that Plaintiff

pronounces words other than those he intends to pronounce.  (*See also* Dkt. No. 69, Attach. 15,

at 152 [pronouncing the word "eagle" but intending to say the word "ego"]; Dkt. No. 69, Attach.

15, at 152-54 [pronouncing the word "brown" but intending to say the word "bound"].)

        In any event, even assuming, for the sake of argument, that Plaintiff has adduced record

evidence from which a rational factfinder could conclude that Defendant Langdon's conflict with

Plaintiff was based on Plaintiff's national origin, and therefore that the non-renewal of Plaintiff's

employment contract occurred under circumstances giving rise to an inference of unlawful

discrimination, Defendants have articulated legitimate, nondiscriminatory reasons for not

renewing Plaintiff's employment with SUNY IT.  More specifically, Defendants have adduced

admissible record evidence establishing that Plaintiff was not renewed because of his IDEA

scores, student complaints, student evaluations, and the recommendations of the Peer Review

Committee, Dean Havlovic, and Vice President Mullick.  As a result, Plaintiff must point to

evidence that reasonably supports a finding of prohibited discrimination.

        In an effort to satisfy his burden of demonstrating that Defendants' reasons for non-

renewal were pretextual, Plaintiff argues that the admissible record evidence establishes the

following: (1) from the fall of 2005 through the spring of 2006, only three student complaints

were filed against Plaintiff; (2) two of these complaints were solicited by Defendant Langdon;

(3) none of these student complaints were presented to Plaintiff, as required by SUNY IT's

applicable grievance procedure or departmental policy (which suggests that the complaints were

not taken seriously); (4) in late June and early July 2006, Defendants Langdon and Havlovic

each told him that he did not need to worry about the prior student complaints, which were

"closed issues"; (5) only one complaint was filed by a student against Plaintiff after he was told

not to worry, which was based on Plaintiff's accent, and was filed after the drop deadline as a

justification for seeking late withdrawal; and (6) the student evaluations of Plaintiff were

"better" than the student evaluations of a comparator whose contract was renewed.

As an initial matter, as stated above, even assuming that the record establishes that a

conflict existed between Plaintiff and Defendant Langdon, a rational factfinder could not

conclude, based on the admissible evidence in the record, that Defendant Langdon's conflict

with Plaintiff was based on Plaintiff's national origin and/or race.

Moreover, even assuming that Defendant Langdon's conflict with Plaintiff was based on

Plaintiff's nationality and/or race, contrary to Plaintiff's argument, the admissible evidence in the

record does not establish that any student complaints were solicited by Defendant Langdon.

Rather, the admissible evidence in the record establishes that students complained to Defendant

Langdon on more than one occasion about Plaintiff's teaching, and, in response to those

complaints, Defendant Langdon told the students to draft a petition and submit it to the Dean of

the School of Business.  (Dkt. No. 69, Attach. 7, at 11-14.)

In addition, the fact that Plaintiff was not informed of student complaints in accordance

with school policy, and was told not to worry about the complaints filed in the spring of 2006

when he was made aware of them, is not evidence that a subsequent decision not to renew

Plaintiff's contract was motivated by Plaintiff's national origin and/or race.  This is especially

true because Plaintiff does not dispute that additional student complaints were filed after he was

allegedly told not to worry about the complaints filed in the spring of 2006.

Furthermore, the evidence in the record establishes as follows: (1) Plaintiff's IDEA

scores were not great; (2) professors on the Peer Review Committee other than Defendant

Langdon expressed concerns about Plaintiff's teaching; (3) the individual who endorsed

Plaintiff's hiring recommended that Plaintiff's contract not be renewed; (4) the individual who hired Plaintiff decided not to renew Plaintiff's employment contract; (5) SUNY IT employs full-time faculty members of Asian and Chinese descent;[3] and (6) while he was a teacher at Bloomberg University, he received negative evaluations about his teaching from several students, as well as complaints about his English, and the Dean of the College of Business stated in his final performance evaluation that one of his "concerns" was "the significant number of ratings in the C and D categories on [Plaintiff's] student evaluations."[4]

In other words, there is admissible evidence in the record that supports the decision not to renew Plaintiff's contract independent of (and uninfluenced by) Defendant Langdon.  In addition, there is no admissible evidence in the record that the student complaints and/or concerns expressed by faculty members other than Defendant Langdon were in any way related to Plaintiff's national origin.  Furthermore, finding a lack of discriminatory motive is supported by the above-described "same actor evidence," the fact that SUNY IT employs people of the same ethnic descent as Plaintiff, and the fact that the concerns expressed by Defendant Langdon, other faculty members, and students were shared by faculty members and students at Bloomberg University.[5]  Simply put, Plaintiff has failed to point to any admissible record evidence from

---

[3]        (Dkt. No. 69, Attach. 15, at 2.)

[4]        (Dkt. No. 69, Attach. 14, at 35, 41-42, 47-50, 53-54.)

[5]        *See Rolle v. Worth Cnty. Sch. Dist*., 128 F. App'x 731, 733 (11th Cir. Apr. 19, 2005) ("Reviewing the evidence, the only possible evidence of motive relates to a single Board member, but an improper motive of one member does not impart discrimination on the entire Board. . . . Additionally, the fact that the Board hired other minorities negates any showing of pretext."); *Grady v. Affiliated Cent., Inc*., 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire."); *Alexander v. Gerhardt Enter., Inc*., 40 F.3d 187, 196 (7th Cir. 1994) (finding that "evidence that [plaintiff] had encountered employment difficulties with previous employers" supported conclusion that defendant had offered legitimate, nondiscriminatory reason for plaintiff's discharge, but affirming "district court's implicit finding that [defendant]'s proffered

which a rational factfinder could find prohibited discrimination.

As a result, Plaintiff's discrimination claim is dismissed.

### B. Plaintiff's Claim of Hostile Work Environment Based on His Race and/or National Origin Under Title VII, 42 U.S.C. § 1981 and the NHHRL[6]

Defendants argue that, to the extent Plaintiff's Amended Complaint may be construed as asserting a claim of a hostile work environment, that claim should be dismissed because a single incident is insufficient as a matter of law to constitute a hostile work environment.  Essentially, Defendants argue that, because Plaintiff has adduced record evidence of only one incident of harassment, Plaintiff's hostile work environment claim must be dismissed.  Defendants further argue that, even if his work environment was hostile, Plaintiff's failure to formally complain about the incident of harassment, as required by the employee handbook, is fatal to his hostile-work-environment claim.

In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff does not address Defendants' challenge to his claim of a hostile work environment.  For this reason, Defendants' burden, with regard to their request for dismissal of that claim, is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a "modest" burden.[7]  After carefully considering

---

reasons were pretextual and that its actual reasons were retaliatory"); *cf. Cutshall v. Potter*, 347 F. Supp.2d 228, 237 (W.D. N.C. 2004) ("[T]he fact that an employer offered a promotion to a member of one race creates a powerful inference that the failure to offer the same promotion to another employee of the same race was not motivated by race discrimination.").

[6]      "Hostile work environment claims under Title VII, § 1981 [and] NYSHRL . . . are . . . analyzed using the same standard."  *Jean-Louis v. Am. Airlines*, 08-CV-3898, 2010 WL 3023943, at *9 n.12 (E.D.N.Y. July 30, 2010).

[7]      *See Rescuecom Corp. v. Chumley*, 07-CV-0690, 2011 WL 2791272, at *3 & n.4 (N.D.N.Y. July 14, 2011) (Suddaby, J.) (collecting authorities); *cf. Frink Am., Inc. v. Champion Road Mach. Ltd.*, 48 F. Supp.2d 198, 209 (N.D.N.Y. 1999) ("Plaintiff does not address these claims in its opposition papers, leading the Court to conclude that it has abandoned them.") (McAvoy, J.)*; Singleton v. City of Newburgh*, 1 F. Supp.2d 306, 312 (S.D.N.Y. 1998) (deeming

the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law.  The Court would add only two points.

First, the Court does liberally construe Plaintiff's Amended Complaint as asserting a claim of a hostile work environment.  (*See*, *e.g.*, Dkt. No. 28, ¶¶ 13-14, 15, 16 ["During the course of his employment by SUNY IT, defendants subjected plaintiff to a hostile work environment, which caused plaintiff great emotional distress and adversely affected plaintiff's ability to do his job. . . .  Plaintiff was subjected to the hostile work because of his nationality and race. . . .  The hostile environment included harassing and intimidating conduct by defendant Langdon."].)

Second, under the circumstances, the single incident involving Plaintiff riding in a car with Dr. Langdon, which did not involve a physical assault or any other "extraordinarily severe" conduct, such as intimidating verbal harassment, and which did not deter Plaintiff from teaching the following semester and seeking employment renewal, does not establish a hostile work environment as a matter of law.[8]

---

plaintiff's claim "abandoned" and granting defendants' motion for summary judgment where claim was alleged in the complaint but "not raised elsewhere in the record"); *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 92-CV-1735, 1998 WL 118174, at *28 (S.D.N.Y. Mar. 16, 1998) (plaintiff's claim deemed "abandoned" and defendant granted summary judgment where plaintiff did not address claim in response to defendant's summary judgment motion); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).

[8]      *See, e.g., Kleehammer v. Monroe Cnty.*, 743 F. Supp.2d 175, 183-85 (W.D.N.Y. 2010) (holding that female deputy sheriff jailor was not subjected to gender based hostile work environment under Title VII or New York State Human Rights Law based on single incident of being subjected to graphic live sex in the workplace); *Kennedy v. J.P. Morgan Chase & Co.*, 325 F. Supp.2d 401, 409 (S.D.N.Y. 2004) (finding that single incident of vice-president of company, entering African-American employee's work area, dressed in a "robber baron" costume with a top hat and cane, approaching employee's desk, and slamming his cane repeatedly on the floor, loudly questioning the presence of "black people" within the company, was not sufficiently severe to support employee's hostile work environment claim); *Samuels v. New York State Dep't*

As a result, Plaintiff's hostile-work-environment claim is dismissed.

### C.    Plaintiff's Claim of Retaliation Based on His Race and/or National Origin Under Title VII, Section 1981 and the NYHRL

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of

Plaintiff's retaliation claim because he has failed to adduce admissible record evidence from

which a rational factfinder could conclude that his non-renewal was retaliatory.  Based on the

current record, the Court accepts Defendants' argument.

"To make out a prima facie case of retaliation, under Title VII, Section 1981 and

NYSHRL, a plaintiff must show [the following]: (1) participation in a protected activity known

to Defendants; (2) an adverse employment action; and (3) a causal connection between the two."

*Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp.2d 305, 341 (S.D.N.Y. 2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily

prohibited discrimination."  *Cruz*, 202 F.3d at 566 (noting that a protected activity need not "rise

to the level of a formal complaint in order to receive statutory protection").  Protected activities

encompass "making complaints to management, writing critical letters to customers, protesting

against discrimination by industry or by society in general, and expressing support of co-workers

who have filed formal charges."  *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d

Cir. 1990).  A plaintiff "need not establish that the conduct [he] opposed was in fact a violation

of [the law]," *Bush v. Fordham Univ.*, 452 F. Supp.2d 394, 416 (S.D.N.Y. 2006), but he must

demonstrate a "good faith, reasonable belief that the underlying challenged actions of the

---

*of Corr. Servs.*, 94-CV-8645, 1997 WL 253209, at *7 (S.D.N.Y. May 14, 1997) (granting
summary judgment, dismissing claim that a single incident of defendant poking plaintiff in the
breast created a hostile work environment); *cf. Patterson v. Cnty. of Oneida*, 375 F.3d 206, 230
(2d Cir. 2004) (finding that "[a]lthough a single incident ordinarily will not give rise to a
cognizable claim for hostile work environment, [an] alleged event [that] included not only racial
remarks but also a physical assault" created a question of fact for the factfinder).

employer violated the law." *Sumner*, 899 F.2d at 209.

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2415 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Similarly, being laid off constitutes adverse employment action. *See Galabya*, 202 F.3d at 640 (2d Cir. 2000); *Walker v. City of New York*, 98-CV-2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997 [was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").[9]

A plaintiff may establish a casual connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield*, 663 F. Supp.2d at 343 (citing *Knight v. City of New York*, 303 F. Supp.2d 485, 496 [S.D.N.Y. 2004]).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.'" *Id.* (quoting *Hunter v. St. Francis Hosp.*, 281 F. Supp.2d 534, 542 [E.D.N.Y. 2003]).

_____

[9]     *Cf. Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009) ("An employee seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions under Title VII and the ADEA.").

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

"Under *McDonnell Douglas*, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield*, 663 F. Supp.2d at 343. "If the . . . defendant . . . points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. El. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Here, Plaintiff argues that complaining to Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, about Defendant Langdon taking him for a car ride constitutes engagement in protected activity. Plaintiff further argues that he has established a casual connection between this protected activity and the adverse action that he suffered.

As an initial matter, the Court rejects Plaintiff's argument that his complaint constitutes protected activity. Although Plaintiff testified (vaguely) that he "report[ed] to Dr. Havlovic [Defendant Langdon's] behavior of coercion, harassment and discrimination," and "mentioned the pattern of what [Defendant Langdon] did to . . . other Asian people," Plaintiff also testified that he did not expressly use the word "discrimination," mention his national origin, or indicate that he felt Defendant Landgon was treating him with discriminatory animus. (Dkt. No. 69, Attach. 14, at 175-80.) Rather, Plaintiff essentially told Dean Havlovic and Anthony Panebianco

that, during a car ride, Defendant Langdon "demanded" or attempted to "coerce" Plaintiff into assisting him with a publication.  (*Id.*)  In other words, a rational factfinder could not conclude, based on Plaintiff's vague testimony about "other Asian people," that Plaintiff accused Defendant Langdon of subjecting him to discrimination on the basis of his national origin and/or race during the car ride.  (*Id.*)

In addition, even assuming, for the sake of argument, that Plaintiff's complaint can be deemed to have been a protest against discrimination (such that Plaintiff has established a prima facie case of retaliation),[10] as stated above in Part III.A. of this Decision and Order, Defendants have articulated legitimate, nondiscriminatory reasons for non-renewal.  More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick.  As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for not renewing him were pretextual, Plaintiff restates the arguments that he advanced regarding his discrimination claim.  This Court has already rejected these arguments.  *See*, *supra*, Part III.A. of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is

**<u>GRANTED</u>**; and it is further

---

[10]     It is undisputed that Defendant Langdon decided not to recommend Plaintiff for renewal within a close time period to him learning about Plaintiff's complaint.

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 28) is **DISMISSED**.  The

clerk of the Court is directed to enter judgment in favor of the defendants and close this case.

Dated: September 14, 2011
           Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge